THE MACON KNITTING COMPANY et al.

*v.*

THE LEICESTER MILLS COMPANY et al.

[Filed July 6th, 1903.]

1. A patentee, in granting a license to use the patented article, impliedly warrants that he possesses the title to the patent-right, and that the licensee will not be evicted therefrom; but he does not warrant the validity of the letters-patent.

Macon Knitting Co. *v.* Leicester Mills Co.·

2. A decree against a licensee of the patentee of a machine, which deter-mines that the machine is an infringement of another patent, in so far as it includes the generic novelty of the latter, is an eviction of the licensee, which will relieve him from the payment of royalties.

3. Where a licensee of a patent-right receives information that· the patent is an infringement of the patent-right of a third person, he need not wait until he is actually evicted, but may abandon the license at once, and avoid the further payment of royalties.

4. After a licensee of a patentee had been evicted by a decree enjoining the use of the patented machine as an infringement of a patent-right of · a third person, an agreement was entered into between the latter and the licensor, by which the licensor was authorized to grant to his former licensee the right to make such machines, and use them for the manu-facture of a specified article; but for no other purpose.—*Held*, that the agreement nullified the effect of the decree.

5. Where an interval of time intervenes between an eviction by such a decree and the execution of the agreement annulling such an eviction, the court will decree specific performance by the licensee, with an allow-ance to him of pecuniary compensation for the loss of the use of the license during the interval.

The following preliminary statement will disclose the general features of the cause to be determined:

On January 2d, 1896, and on November 18th, 1895, patents were allowed to Joseph Bennor for certain improvements in straight knitting jackets for making fashioned hosiery. On September 14th, 1894, Bennor conveyed a one-half interest in this invention to the Macon Knitting Company, the other com-plainant.

On February 10th, 1896, the complainants entered into an agreement with the defendant the Leicester Mills Company, by which they granted to the latter company an exclusive license to manufacture in the United States, for its own use therein, to the end of the term for which such letters-patent were, or might be, granted, knitting machines containing the above-men-tioned patented improvements, granting it the sole right in the United States to use the said machines in the manufacture of knitted goods of wool, worsted and merino, and of no ·other material and for no other purpose.

By said agreement complainant contracted to build and furnish to the defendants twenty knitting machines of the con-struction specified in the application for said patents for a cash

price amounting to ten per cent. above the cost of their construction, but not to exceed $200 each, which said machines the defendants were to have the right to use in the manufacture of the specified goods, and which machines it was agreed should be practically operative and built in a workmanlike manner.

Complainants agreed to assist the defendants in placing said machines in its factory and to impart to a competent person, to be designated by said defendants, proper instruction for operating the machines.

The defendant agreed that, upon the delivery to it of the twenty machines, and upon the practical operation of said machines, the defendants would forthwith assign to the complainant fifty shares of the capital stock of the said Leicester Mills Company, of the par value of $100 per share, together with the bonds of the said company of the value of $5,000.

The defendant also agreed that, on January 1st, 1898, or before that time, if it had constructed eighty machines, it would assign one hundred more shares of its capital stock and the same amount of bonds.

The first installment of stock and bonds was delivered, but the second installment has not been delivered, and it is to compel the delivery of the latter stock and bonds that this bill is filed.

The answer, as well as the answer by way of cross-bill, sets up that the defendant was induced to execute the agreement by the false representation of the complainants that the machines would produce stockings that would be shaped in process of manufacture and would be marketable as first-class goods; that it delivered the first installment of stock and bonds, relying upon the contract and upon the further assurance already mentioned; that it cost $400 to make each machine; that they were not practically operative; that the manufactured product was not first class and merchantable, but had to be darned and sold as second-class goods.

The cross-bill sets up the same facts, and prays that the stock and bonds already delivered may be redelivered to the defendants, and that damages may be awarded for the expenditure

Macon Knitting Co. v. Leicester Mills Co.

made by defendants in reliance upon the representations made and the written covenants executed by the complainant.

The supplemental answer sets up that the patents were infringements of a preceding patent owned by the Powells, and so the complainants had no title to convey, and that that question was then being litigated in a federal court.

By a stipulation this last question was held in abeyance until a decision by the federal tribunal, which decision was to be regarded as decisive in this court. A decision has been rendered in favor of the defendants, the character and effect of which decree will be presently considered.

*Mr. Francis C. Lowthorp* and *Mr. Hector T. Fenton,* for the complainants.

*Mr. Edward H. Murphy, Mr. Joshua Pusey* and *Mr. Joseph Jenkins,* for the defendants.

REED, V. C.

Of the two complainants, the Macon Knitting Company and Joseph Bennor, each owning a one-half interest in the machines sold and in the right to manufacture and use like machines, Mr. Bennor was the inventor and patentee of the machines sold to the Leicester Mills Company. Previous to the sale the latter company was a dealer in woolen yarn, and for about two years had been selling these goods to the Macon Knitting Company. Mr. Bennor, then interested in the business of the Macon Knitting Company, in his intercourse with the officers of the Leicester Mills Company concerning the purchase of woolen yarn, spoke to them about the knitting machines. In consequence of his talk with them, Mr. Wilson H. Brown, the vice-president and treasurer of the Leicester Mills Company, accompanied Mr. Bennor to Macon, and saw the machines in operation. The result of the conversation and of this visit was that the contract already mentioned was entered into between Mr. Bennor and the Macon Knitting Company, on the one side, and the Leicester Mills Company, on the other side.

Of the twenty machines sold, six were sent to Germantown, where the Leicester mills factory was located, on July 25th, six on September 11th, and eight on November 4th, 1896.

In the latter part of July, or the first part of August, of that year, Joseph N. Bennor, Jr., the son of the patentee, went to the Leicester mills to superintend the setting up and putting into operation the machines sold, and remained there until July, 1897. The Leicester mills people constructed a shop for the purpose of building the additional machines mentioned in the contract. Mr. Bennor, who arrived at Germantown before the arrival of the first installment of machines, devoted his time to starting up the machines shipped, making the tools, putting in the shafting and preparing for the purpose of manufacturing machines. He says he set up the first arriving machines as soon as they got the shafting in, but that it took some time to get ready to run them; he had to experiment on yarns—some of it was twisted too hard, some had little pieces or burrs on it, and some was irregular in size, "and we had to get our samples of proper weights before we could start the machines." It is to be remarked here that the machines, while at Macon, had run on cotton, excepting in those instances where samples were made from yarn sent to them. Mr. Bennor further says that he got the first of these machines started in the latter part of September, 1896, and he had them all at work by the 1st of December. Much of Mr. Bennor's time was given to the machine shop, and therefore, to assist him, Mr. James T. Hall was sent from the Macon Knitting Company about the 1st of February, 1897. Mr. Hall was the foreman of the knitting-room at the Macon mill. Mr. Hall ran the knitting machines from the time he came until he left, which was some time in March. Before Mr. Hall came, Mr. Bennor had a boy, whom he taught to help him run the machines. This boy remained until the first week that Mr. Hall was there, and then another boy was hired, who remained two or three weeks after Mr. Hall left. He was discharged by the officers of the Leicester Mills Company. After Mr. Hall left the Leicester Mills Company employed Mr. Thomas W. Tustin, who began to work in the second week in May, and remained about one year. Mr. Bennor and he were there to-

gether from the second week in May until about July 4th, when Mr. Bennor left, and Mr. Tustin was alone until the Leicester Mills Company ceased using the machines. The machines ran until December. On December 21st, 1897, Mr. Wilson H. Brown, the treasurer of the Leicester Mills Company, wrote to Mr. Bennor, stating that the machines were not "practically operative," and notifying him that the Leicester Mills Company rescinded the agreement, and asked him to reinstate them in the same position as before the agreement was made.

On December 24th Mr. Bennor replied, refusing to entertain the proposition.

On March 8th, 1898, Mr. Bennor and the Macon Knitting Company filed the bill in this cause, and on April 29th the defendants filed their answer and cross-bill.

The bill, as already observed, asserts that the machines were "practically operative." The answer and cross-bill charged that they were not "practically operative;" and further charged that there were false representations made which induced the execution of the contract. In detailing these representations the answer states that the defendants were induced to enter into the contract by the statement that the machines would, could and should produce stockings that would be shaped in process of manufacture, and would be marketable as first-class goods. The answer then states that the stockings produced required to be darned, which made them unsalable as first-class goods.

The prolonged operation of these machines by the defendants is explained by the statement that they notified Mr. Bennor in July, 1897, that the machines were not in accordance with the agreement, and that Mr. Bennor requested defendants to give them a further trial, and agreed that if they were not found to be satisfactory by January 1st, 1898, they would be taken back and the defendants would be reinstated in their original position.

The cross-bill charges that at the time of the execution of the agreement it was agreed that the words "practically operative" meant that the machines would produce fashioned stockings that would be marketable as first-class goods. It charges that all the stockings produced by the machines had holes in them, which

Macon Knitting Co. *v.* Leicester Mills Co.

required to be darned, and so made them unsalable as first-class goods; that frequent and constant complaints were made to the complainants of this state of affairs, and as frequent promises were made by them that the defects would be remedied and that the complainants would demonstrate that the machines would produce first-class goods. The cross-bill restates the conversation in July, already set out in the answer. The cross-bill also sets up that large sums of money were expended in buying special tools, &c., to equip the shop and run the machines at a large expense, and that they also lost much in the manufacture of unsalable goods. It charges a failure of consideration and a failure to perform the conditions to be performed by the complainants. It asks that the complainants may be decreed to return the stock and bonds and interest already received, and also to pay the amount expended by the defendants already mentioned.

It is to be observed that the cross-bill does not ask for the recision on the ground of fraud, nor do I find evidence of any fraudulent representation of any subsisting fact made by the complainants. Whether the machines were or were not "practically operative" in fact, in the sense in which the words are used in the contract, I am quite clear that Mr. Bennor thought the machines would do what he said they would do. The primary question in the case is whether the machines delivered were "practically operative." In that question is also involved the practical effectiveness of the machines to be manufactured, and consequently the value of the license to manufacture. Inasmuch as the inoperativeness of the twenty machines is attributed to defects in design and not to defects in construction, the proof of the inefficiency of the first twenty machines carries with it the presumption of similar inefficiency in every machine which was to be built under the license. Practical operativeness is to be tested by the purpose for which the machine is built and sold. A machine may operate practically to make bricks, but if sold for the purpose of making tiles it would be absurd to speak of it as "practically operative." The contract itself recites the grant to Mr. Bennor of the patents for an improvement in stock-

ings, and the art of making them, and improvements in straight knitting machines for making fashioned hosiery, and recites that the Leicester Mills Company were desirous of manufacturing knitting machines containing those improvements, and acquiring the exclusive right to manufacture thereon knitted stockings of wool, worsted and merino, together with other knitted goods of wool, worsted and merino. Then there follows a license to manufacture such knitting machines, with the sole right to use the said machines in the manufacture of knitted goods of wool, worsted and merino, but of no other material.

It thus appears that the machines were to be "practically operative" in making knitted woolen goods, including fashioned hosiery. It is apparent also that the machines were to make seamless hose. Now, a machine might make a fashioned seamless hose, and yet not be "practically operative." Its operativeness must be measured by the work of other knitting machines in respect to the quantity and quality of the goods produced, the durability of the machine, its freedom from liability to disarrangement and its liability to waste yarn.

[Here follows a review of the testimony directed to the question whether the machines were practically operative, followed by the conclusion of the vice-chancellor that the machines were practically operative. This portion of the opinion is omitted by direction of the vice-chancellor.]

There are, however, other questions in the case. After the original cross-bill and answer were filed, mainly attacking the operativeness of the machines, a supplemental cross-bill and an answer were filed setting up, in substance, that the machines in question were, in some material part, infringements upon the rights of Messrs. Powell, the owners of a patent for an improvement in the web-holding actuating mechanism for automatic knitting machines; that on November 12th, 1898, the Messrs. Powell had begun a suit against the defendants because of such infringement. In the complainants' answer to the cross-bill they admit the pendency of the suit, but denied the fact of infringement.

Upon the trial of the present case it was stipulated that the de-

cision of the issue raised by these supplemental pleadings should be suspended until after the decision of the federal court in the suit mentioned, and that the decree of the court in that case might be pleaded in this as to its legal effect in this court, subject to an appeal in the *Powell Case.*

On appeal to the circuit court of appeals, the decree of the circuit court holding that there had been no infringement was reversed and the record was remitted to the circuit court, where, on October 25th, it was decreed that the Browns had infringed the Powell patents and their exclusive right thereunder by the manufacture and use of knitting machines having web-holding actuating mechanism, substantially the same in construction and operation as in the Powell patents. This decree has been pleaded and is in evidence by stipulation in this suit. The conclusion of this decree of the federal circuit court is this: "It being shown to the court by stipulation this day filed and now made a part of this decree, that the intervening defendant, the Macon Knitting Company, has made settlement with complainants for said infringement, and has taken a license under said letters-patent, as in and by said stipulation appears, and complainants having thereupon waived an account of profits and damages and injunction, it is decreed that the complainants do recover of said defendant (Brown) and intervening defendant (Macon Knitting Company) the costs of suit."

Now, this stipulation is not a part of the judgment, but is recited to show why there is no injunction, order and decree for an accounting, namely, because the complainant waives his right to such decree. The recital amounts to an admission in open court by the parties that the annexed stipulation had been executed. The decision of the circuit court of appeals was rendered on April 4th, 1901, and the stipulation annexed to the final decree is dated July 3d, 1901. The stipulation or agreement witnessed that the Powells, owners of letters-patent of the United States, No. 510,934, dated December 19th, 1893, for improvements in web-holder actuating mechanism for knitting machines for and in consideration of the sum of five thousand dollars ($5,000) and other good and valuable considerations us in hand paid, have authorized and empowered, and do hereby

authorize and empower the Macon Knitting Company to sub-license and empower the Leicester Mills Company, and no other party or parties, retroactively from the date of the said letters-patent, and hereafter during the remainder of the term thereof, to make for its own use only, and to use said patented web-holder actuating mechanism in or upon or as part of knitting machines heretofore employed or hereafter to be employed by the said Leicester Mills Company, exclusively in the knitting of hosiery or other goods from woolen, worsted or merino yarns, and for no other purpose or purposes.

That the intent of this instrument was to authorize and license, subject to the terms, conditions and limitations hereinabove expressed, as well the use theretofore by the said Leicester Mills Company as the continued use thereafter during the term of said letters-patent No. 510,934 of said patented web-holder actuating mechanism to and upon twenty (20) knitting machines heretofore made by the said Macon Knitting Company and Joseph Bennor and by them sold and delivered to the said Leicester Mills Company under a certain license agreement made by and between the said Bennor and the said Macon Knitting Company, of the one part, and the said Leicester Mills Company and Wilson H. Brown, of the other part, dated the 10th day of February, A. D. 1896; and also to authorize and license the said Leicester Mills Company, subject to the same restrictions and limitations as to use, as well the manufacture and use by said Leicester Mills Company heretofore as also the manufacture and use hereafter, during the term of said letters-patent, of other specimens of said patented device in or upon or as part of any knitting machines made, or to be made and used, or to be used, by the said Leicester Mills Company under and in accordance with the terms of said agreement of February 10th, 1896, copy of which is hereto annexed, marked "*Exhibit A,*" and for no other purpose or purposes; to the end that said Leicester Mills Company, as the sub-licensee of the said Macon Knitting Company hereunder, shall not be evicted, disturbed or interfered with by reason of said recited letters-patent No. 510,934, owned by said licensors herein, from and in the full

enjoyment of all the rights and privileges granted to it, the said Leicester Mills Company, by the Macon Knitting Company and Joseph Bennor in and by said recited licensed contract or agreement, nor be held liable to the said licensors herein, in damages for infringement or costs of suit in any action brought, or to be brought, by them under said recited letters-patent for any acts rightly done by the said Leicester Mills Company in the exercise of such license rights as by the said recited contract of February 10th, 1896, have been granted to or vested in them; it being the further declared intent and object of this instrument to settle and adjust the claim and demand for which a suit in equity was lately brought by the said licensors as complainants, in the circuit court of the United States for the eastern district of Pennsylvania, of October sessions, 1898, No. 20, against the said Leicester Mills Company and its officers as defendants, with the said Macon Knitting Company and Joseph Bennor as intervenors, and to discharge, release and acquit as well said defendants as also said intervening defendants of and from all liability for damages and costs which have been, or might be, adjudged, ascertained or assessed therein.

The question which presents itself is, what are the rights of the parties, in view of the decree coupled with the agreement just displayed?

It is first insisted by the defendants that they are assignees, and not licensees, and that the rule respecting the failure of consideration resulting from the invalidity of the patents should be applied as if the agreement for the use of these patent rights was an assignment.

Whether the rule respecting the right of an assignee to set up the invalidity of a patent differs from the right of a licensee to do the same, is not to be considered; for the defendants are clearly licensees, and not assignees. Any assignment which does not transfer the whole patent, or an undivided part of the whole patent, or an exclusive right to some part of the country, is a mere license. *Waterman v. McKenzie, 138 U. S. 252.*

This transfer did neither of these three things; it did not transfer the whole or an undivided part of the patent, and it did not transfer an exclusive right to use the same in the whole

or any part of the United States. It only transferred the exclusive right to use the patented machine for one use, namely, for the manufacture of woolen goods.

What, then, is the privilege of the defendants as licensees? There is a line of cases holding that a licensee cannot set up the invalidity of a patent, the right to use which he holds by license, unless there has been something equivalent to an eviction of the licensee. Judge Lowell, in *White* v. *Lee, 14 Fed. Rep. 789, 791*, said: "The law is, I think, that a plea or answer that a patent is void is not of itself a sufficient defence, but that evidence of what may be called an eviction is such defence. The difficulty is to ascertain what amounts to an eviction in patent cases. It is easily discovered whether the tenant of a certain piece of land has or has not been evicted; but if a patent is void, still the licensee may have had all the benefit of a valid patent, because his exclusive title may never have been disputed."

In that case there was no suggestion that the exercise of the pretended right conferred by license was any violation of the rights of a patentee superior to the licensor. The invalidity of the licensor's patent defeated the exclusive right of the licensee, and put him upon a footing equal with the world, but did not expose him to liability for infringement. He could still recognize and use his license and receive the protection of what the world might suppose or recognize as an exclusive license in fact.

In this group of cases, so long as a licensee recognizes the license and uses it, he must pay the royalties which accrue under the terms of his license. If, however, the patent was adjudged invalid, or was repealed by judicial decree, this amounts to an eviction.

In my judgment the decree of the circuit court of appeals must be regarded as an eviction.

It is, indeed, insisted that the Bennor patents have not been annulled. It is said that the decree in the infringement suit only established the fact that in some respects only the Bennor were infringements of the Powell patents.

It is true that the decree in the infringement suit only establishes the fact that the Bennor patent is invalid only so far as it includes the generic novelty already obtained by Powell. In

no other respect was the Bennor patent directly or inferentially annulled. But it is manifest that no one could use the Bennor machines without infringing the Bennor patent, as well as the Powell patent. It is obvious that the licensees could not use the machine without liability to Powell for damages for every days' use; and I am unable to understand how the effect of a decree for infringement differs this from any other case, except in respect to the amount of damages recoverable by the superior patentee. The decree for infringement amounted to an eviction. An eviction occurs whenever a licensee is enjoined from acting on it at the suit of the owner of a senior patent; and, by parity of reasoning, it occurs whenever a judgment or decree is obtained by the owner of a senior patent against the licensee for an infringement which consists of acting under the license. *Walk. Pat. (3d ed.)* § *307.*

It is clear, therefore, that putting aside for a moment the effect of the agreement entered into between the Bennors and the Macon Mills Company, on the one part, and the Powells, on the other, that the complainants cannot compel the delivery to them of the remaining bonds and stock of what constituted the consideration for the license.

The question then recurs—what is the effect of the agreement thus referred to?

By this agreement the Powells licensed and empowered the Macon Knitting Company to sub-license and empower the Leicester Mills Company to make for its own use only, and to use said patented web-holding actuating mechanism upon or as a part of the knitting machines heretofore or hereafter employed by the Leicester Mills Company exclusively in the knitting of hosiery or other goods from woolen, worsted or merino yarn.

Now, the defendants insist that this agreement does not restore them to the position which they would have occupied had the original license protected them from all liability to a suit for an infringement. This appears to be so. First, the license purported to give the complainants the exclusive right to use the web-holding actuating mechanism. The stipulation only confers the right to use it in common with others who may acquire the same rights from the Powells.

Again, the Powell patents expire before the Bennor patents, and so the use of the device mentioned will be thrown open to the world before the end of the period of exclusive use which the original license granted to the complainants. What the stipulation does is to release the complainant from liability for past infringement, and to entitle it to use in future the Bennor machines free from any claim by the Powells.

But by doing this the agreement, I think, nullified the effect of the eviction proved by the decree of infringement. This is the effect of the rule, as I understand it, that while there is an implied warranty of title by the licensor, there is no warranty of the validity of the letters-patent. All that the licensor warrants is that the licensee shall not be evicted from his enjoyment of his rights under his license. *Walk. Pat. 257.*

The licensor deflected the force of the decree, which would have otherwise amounted to an eviction. By force of the agreement with the Powells the disturbing force of the decree was arrested at the moment of its birth.

Therefore, if the eviction rested solely upon the entry of the decree in the Powell suit, there would exist no defence whatever.

But there is another aspect of the case to be considered. The defendants ceased to use the license from the Macon Knitting Company in January, 1898. On November 21st, 1898, the defendants filed their supplemental answer and cross-bill praying for a recision of the contract, on the ground that the Bennor patents were invalid and because they infringed the Powell patent. From that date the cessation from use by the defendants of their license must be regarded, in part, at least, as caused by the paramount title claimed by the Powells.

It is perceived, therefore, that from November 21st, 1898, until October 25th, 1901, the date of the infringing decree, the defendants not only did not use the machines, but could not use them without being liable for infringement, and it appears that they had asked for a recision of the license agreement upon that ground.

There is a class of cases in which a licensee can successfully defend against an action for royalties when there has been no eviction.

If the patent which he is licensed to use is an entire nullity—if it is inoperative, not merely in respect to some of its claims, but in all of its claims—the licensee need not wait until some act equivalent to an eviction occurs. In this class of cases the weight of authority is, that without an eviction, where there are no recitals in the license recognizing the validity of the patent, the licensee can cease to recognize and act under the license by notice to the licensor of his determination to repudiate the license. Thereafter, if the patent proves to be invalid, the licensee is free to use and manufacture without liability to pay royalty; if the patent proves to be valid, the licensee thereafter is liable to the licensor for damages as an infringer.

In *Crossley* v. *Dixon, 20 Eng. Rul. Cas. 764; 10 H. L. Cas. 293*, Lord-Chancellor Westbury said: "The license being the foundation of the claim (for royalties) and being, of course, determinable by it, if he chooses to put an end to that license, it follows that the present appellant (the licensee) if he continues to use the machine, must treat him as a person infringing their patent rights." Lord Chelinsford said: "He (the licensee) cannot act under the agreement and at the same time repudiate it. He may, if he pleases, put an end to the agreement, and he may use the machine which he has purchased from the appellants (the licensors), but he must do so at his peril. He must do it under the liability to be treated as an infringer, and be subject to an action for damages for that infringement."

In *Marston* v. *Sweet, 82 N. Y. 526, 534*, the rule laid down by Judge Earle in *Lawes* v. *Purser, 38 L. & E. Rep. 48,* was adopted, namely, that if the plaintiff believed the patent to be valid, and the defendant believed so too, the defendant must pay for the privilege until after he can show that the patents have been rescinded or revoked, or that notice has been given to the plaintiff that the defendant will not pay any more under the contract.

And in *Mudgett* v. *Thomas, 55 Fed. Rep. 645*, the judicial language was that if the exclusive licensee, under a license which contained no recitals as to the validity of the patent, repudiates and abandons the license, he is not estopped from setting up the invalidity of the patent for lack of invention or want of novelty

Macon Knitting Co. *v.* Leicester .Mills Co.

as a defence to an action for royalties alleged to have become payable subsequent to the repudiation.    The cases are reviewed by Judge Sage in his opinion in this case.    Upon this point are the cases of *Harlow* v. *Putnam, 124 Mass. 553; Standard Button Fastening Co.* v. *Ellis, 159 Mass. 448; Edison General Electric Co.* v. *Thackara My. Co., 167 Pa. St. 530.*

This rule seems inapplicable, however, when the patent, while invalid as to some of the points claimed, is valid as to others. The continued use of a license, received from such a patentee, would leave the licensee liable for royalties, and also responsible for infringing the rights of any paramount patentee.

But while he may not free himself from liabilities, if he continues to use the license, I am of the opinion that such a licensee can cease to use and repudiate his license. He is not bound to wait until he is actually evicted by a paramount owner.

The doctrine of estoppel which is applied to a licensee is analogous to that applied to a tenant.    The well-known rule as to the latter is that, so long as he remains in undisturbed possession, he is estopped from attacking the title under which he entered, unless his entry was induced by the fraud of the landlord, or by mistake, or for some unlawful purpose.    The fact that the lease is void, or that the lessor has no title whatever, makes no difference.    If a lessee is in possession as a tenant, he must pay for what he enjoys.    If his possession is disturbed by what amounts to an eviction, either by the landlord or by the owner of a paramount title, the right of the landlord to rent from that moment ceases.    Nor is it necessary for the tenant to await the entry of a judgment against him.    In case some claimant of a paramount title asserts his right against a tenant, the latter is not bound to remain in possession, and so become liable to pay rent to his landlord and also damages to the claimant. He can abandon the possession of the leased premises, and take his chance of establishing his liability to be ejected by the paramount claimant.    If he proves the existence of such liability, there can be no recovery for rent from the time of the tenant's abandonment.

So a licensee, who may become aware of a claim of a right paramount to that of his licensor, may, upon the same principle,

repudiate his license, abandon its use, and, if the existence of the paramount right is established, the licensee is discharged from the payment of royalties subsequent to the date of his cessation from use.

This is the posture of the defendants. From November 21st, 1898, until October 28th, 1901, their abandonment of the use of the license discharged them from any liability to pay royalties for that period.

The question then arises, what is the equitable course to be taken in dealing with this situation?

Should the court refuse to grant any relief, or should it decree specific performance, with an allowance to the defendants of a pecuniary compensation equal to the royalties which would have accrued during the idle period?

The allowance of compensation, in suits for specific performance, is a familiar feature in the administration of equity jurisprudence. When jurisdiction to decree a specific performance exists by reason of the character of the contract to be performed, a court, if it finds that it is beyond the ability of a party to specifically execute its terms, will compel him to do so, as far as he can, and will compel him to compensate in money for so much of the contract as he cannot specifically perform.

Even if the party cannot perform any part of the contract, equity does not hesitate to decree compensation for the whole.

That this court has jurisdiction in this case is clear.

Jurisdiction rests upon two grounds—*first,* because the subject-matter of the contract is a patent, and *second,* because the consideration was securities not listed, and so, without a market value. The power of this court to decree compensation in this class of cases cannot be doubted.

The instances in which this power has been exerted have been generally where the defendant has been unable to deliver what he had bargained to deliver, and the complainant is content to accept pecuniary compensation. When, however, it is sought to compel a defendant to accept that for which he has not contracted, the case presents quite another aspect. There must be circumstances rare and peculiar to induce a court to so decree.

The present case is *sui generis.* The contract has been par-

Macon Knitting Co. v. Leicester Mills Co.

tially performed.   The securities have been in part delivered. The license has been for a time enjoyed.   There is nothing to indicate that the existence of a paramount title in the Powells was suspected by the licensors until suit was brought for an infringement.

The conditions which its existence created were remedied as soon as it was judicially determined that there was a paramount right.

Then, too, it is to be particularly observed that the cessation from use began, not because of a knowledge of the claim made by the Powells, but because of defendant's insistence that the machines were inoperative.   It is quite likely that had the Powell claim been the only objection to the further use of the license, the licensor would have indemnified the defendant at once against liability for any infringement.

In view of these conditions, I have concluded to advise a decree that the defendants shall deliver the remaining stock and bonds upon being compensated in money for the loss of the use of the license for the period beginning when the defendant filed its amended answer and ending with the final decree in the Powell suit, at which time the defendants first had knowledge of the execution of the new license by the Powells.

There will be a reference to a master to find the amount of such compensation.

A decree will be framed upon notice by the counsel of the complainants to the counsel of the defendants.